---

(96 Misc. Rep. 419)

### In re LELAND'S WILL.

(Surrogate's Court, New York County. July 6, 1916.)

1. EXECUTORS AND ADMINISTRATORS ⟨⟩20(1)—APPLICATION FOR LETTERS—PROCEEDINGS.

Where right to receive letters testamentary is controverted, the issue is heard in a separate proceeding after the probate of the will, for convenience of the parties and the court.

[Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. ⟨⟩20(1).]

2. EXECUTORS AND ADMINISTRATORS ⟨⟩20(1)—APPLICATION FOR LETTERS—PROCEEDINGS.

A separate proceeding for letters is a proceeding in rem.

[Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. ⟨⟩20(1).]

3. EXECUTORS AND ADMINISTRATORS ⊂⊃74—APPOINTMENT—NECESSITY.

An executor derives his office and estate from the will at the moment of testator's death, and not from probate or letters testamentary; the common-law rule not having been changed.

[Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. ⊂⊃74.]

4. EXECUTORS AND ADMINISTRATORS ⊂⊃74—ESTATE—NATURE.

The estate of an executor is not strictly proprietary, but is held for another.

[Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. ⊂⊃74.]

5. EXECUTORS AND ADMINISTRATORS ⊂⊃14—APPOINTMENT—CONSIDERATIONS.

In considering the application for letters of one named as executor, his common-law right to the executorship is the primary consideration, and the rights of creditors or legatees cannot be considered, since such application for letters is an invocation of the law, not of equity.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 29–31, 42; Dec. Dig. ⊂⊃14.]

6. EXECUTORS AND ADMINISTRATORS ⊂⊃14—APPOINTMENT—CHOICE OF TESTATOR.

The undisputed probate of a will entitles to the greatest consideration the desire and choice of testator as to who shall be his executors.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 29–31, 42; Dec. Dig. ⊂⊃14.]

7. EXECUTORS AND ADMINISTRATORS ⊂⊃15—COMPETENCY OF PERSON NAMED EXECUTOR—"WANT OF UNDERSTANDING."

Under Code Civ. Proc. § 2564, describing those incompetent to receive letters testamentary, the phrase incompetent for "want of understanding" refers only to common understanding, and is not to be determined by the extent of the estate, nor the peculiar difficulties of a particular administration.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 32–35; Dec. Dig. ⊂⊃15.

For other definitions, see Words and Phrases, Want of Understanding.]

8. EXECUTORS AND ADMINISTRATORS ⊂⊃15—COMPETENCY OF PERSON NAMED EXECUTOR.

That one named as executor has suffered two severe paralytic attacks and great physical deterioration does not disqualify him as executor, if his mind is not thereby affected.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 32–35; Dec. Dig. ⊂⊃15.]

9. EXECUTORS AND ADMINISTRATORS ⊂⊃15—COMPETENCY OF PERSON NAMED EXECUTOR.

A man may be chosen executor for his moral worth alone, the testator ignoring his want of business ability; the latter not rendering him incompetent for "want of understanding."

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 32–35; Dec. Dig. ⊂⊃15.]

10. EXECUTORS AND ADMINISTRATORS ⊂⊃15—COMPETENCY OF PERSON NAMED EXECUTOR.

If there be no "want of understanding" in the common-law sense of the term, the person named as executor is entitled to letters.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 32–35; Dec. Dig. ⊂⊃15.]

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

11. Executors and Administrators  ⊂⟹29(5)—Appointment—Matters Concluded.

> The appointment of an executor, although contested, is not res judicata of the rights of those interested in the estate to apply for his removal at any time for incapacity; such later application involving equitable considerations, while the application for appointment is based on the common-law right to letters of the person named as executor.
>
> [Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 181; Dec. Dig. ⊂⟹29(5).]

Application for letters testamentary based on the probate of the will of Francis L. Leland, deceased. Application granted.

Order reversed, 161 N. Y. Supp. 316. See, also, 95 Misc. Rep. 440, 159 N. Y. Supp. 533.

Kellogg & Rose, of New York City (L. Laflin Kellogg, of New York City, of counsel), for petitioner.

Olney & Comstock, of New York City (Robert C. Beatty, William A. Purrington, and Jesse Grant Roe, all of New York City, of counsel), for objectors.

A. Perry Osborn, of New York City, special guardian.

FOWLER, S. [1, 2] The will of Francis L. Leland is not contested and a degree for its probate has duly passed. This is an independent application for letters testamentary based on the probate. Where the right to receive letters testamentary is controverted, the issue is thereafter carried on as a proceeding separate and apart from the probate proceeding, which is then confined to factum only. This division of the proceeding for probate and letters into two parts is a mere matter of practice for the convenience of the parties and the court. Matter of Mayer, 84 Misc. Rep. 9, 145 N. Y. Supp. 665. The gravity of the issue on this particular application for letters shows the wisdom of the practice of dividing the proceedings, now followed in this court, when there is a contest over the letters but none over probate. A separate proceeding for letters is a proceeding in rem. Quidort v. Pergeaux, 18 N. J. Eq. 472, 477.

Objections to the issuance of letters to Dr. Timothy M. Cheeseman, one of the three executors nominated by the will, have been filed, and such issuance is contested by all the adult members of the testator's family and by the guardian of the infants. It appears that Francis C. Cantine, nominated as coexecutor, is dead; Pedro de Florez, also nominated as coexecutor, lives in Paris, France, refuses to qualify, and has formally renounced his right to letters. Therefore Dr. Cheeseman is the sole applicant for such letters in this contested proceeding, which must now be decided on relevant and sufficient proofs. Burwell v. Shaw, 2 Bradf. Sur. 322; In re Ferris' Will, Tuck. 15. The estate of Mr. Leland is very great and the matter is of the first importance.

Before proceeding to the merits of the contention, let me outline the extent of the abstract right of one nominated by will as an executor to receive letters testamentary, and also the nature of the limitations imposed by law on that right. I will also consider briefly the law governing the office of an executor. It is always well in any grave contest to recur to first principles, which are the rudder of the law.

It was subsequent to the Reformation that most of the present common law relating to executors was formulated. In other words, our common law in reference to the office and duties of executors rarely goes back of the reign of Edward VI. The earliest accurate and systematic exposition of this modern common law is to be found well stated in Godolphin's Orphans' Legacy (edition of 1677) and in the treatise known as Wentworth's Office and Duty of Executors (edition of 1641), so often reissued by later editors. At common law the spiritual courts could not refuse to grant authority to executors for any reason except excommunication, or idiocy, or lunacy. Godolphin's Orphans' Legacy, c. 6. In the last two instances the incapacity was only because idiots and lunatics were incapable of expressing an acceptance. Bacon, Abr. Ex'r, A, 5; Walker on Executors, 8; Toller, Ex'r, 32; Ingpen, Ex'r, 52. To exclude any one from his right to the office of an executor, derived from the will itself, very stringent grounds must have been alleged. Walker on Ex'rs, 8.

Wentworth in his first edition (edition of 1641) makes no exception to the competency of executors, except excommunication, which he says only stays the execution until absolution. This important statement was continued as late at the fourteenth London edition, from which was reprinted the first American edition (1832, p. 38). But in some of the later editions of Wentworth's celebrated treatise, known as Toller on Executors, not only idiots and the insane were conceded to be disqualified from executorship, but those whose intellects are destroyed by age, disease, intemperance, or by blindness and deafness, the common inlets of understanding. No other cause disqualified an executor at common law; proof of mere weakness of mind never incapacitated an executor. Per Sir H. Jenner Fust, Evans v. Tyler, 2 Rob. 128, 131, 132; Wentworth (6th Ed. by Toller) p. 34. Wentworth's book, it must be remembered, was the precursor of all the modern books on Executors, and was probably prepared by the learned Mr. Justice Dodderidge. This treatise stands in the exceptionable position of a text-book or abstract discussion possessing some weight in the regular courts. I do not pretend that it is a source of law, for I am quite aware that only one or two text-books are sources of law in our system of jurisprudence. What I mean is that Wentworth is regarded by courts as generally correct in his statements of fact and in his deductions and citations.

It is the fact, I think, that the additional incapacities of executors, specified by Toller in later editions of Wentworth, are all due to decisions founded directly or indirectly on modern statutes. The text of Bacon's Abridgment (Ex'r, A, 5) and Godolphin's Orphans' Legacy (chapter 6), as well as Wentworth's own early editions (several of which I possess), would seem to prove that this was the fact. Without that further examination, which I regret not to be able to make at this time, these secondary authorities seem to authorize the conclusion that the additional or modern disabilities of executors are in our law all founded on modern statutes of one kind or another. I am somewhat confirmed in this conclusion by the fact that the spiritual courts, which at common law had sole jurisdiction to issue letters testamentary (except, perhaps, in a few common-law manors), could refuse letters tes-

tamentary for exceedingly few causes, mainly of a spiritual nature. These disabilities were at common law those prescribed by legatine constitutions, by the canon law, or by the civil law supplementing the canon law. I do not, however, feel it necessary at this time to trace the origin of each disability or to examine the disqualifications of executors in the spiritual courts prior to the Reformation, as the practice of the reformed ecclesiastical courts, founded after Edward VI, is the primary source of the common law of this state, now administered in this court by constitutional limitation. Of course at times our modern common law may, as in England, be referred back for its origin to the canon law and, failing that, to the civil law. Such instances rarely occur in practice, but they do occur. In the particular matter now here we are, however, concerned only with the modern common law of this court.

There can be no doubt that after Edward VI the right of one nominated as an executor to have and to enjoy his office was almost absolute, and it was rarely defeated, except by a complete want of understanding or incapacity to signify an acceptance upon the part of the nominee Per Holt, C. J., Rex v. Raines, 1 Lord Raym. 364; Hathornthwaite v. Russel, 2 Atk. 126. So strict was this rule that even an attaint or an outlawry did not disable one to be an executor. The consequence of this doctrine was that chancery was sometimes forced to interfere and to appoint a receiver where an executor had proved himself disqualified. Rex v. Simpson, 1 W. Black. 456. But independently of statute a court of equity could not remove an executor; it could only appoint a receiver. Bolles v. Bolles, 44 N. J. Eq. 385, 14 Atl. 593. Removal of an executor, as I intimated to counsel on the argument, is quite another thing from the sanction of a court preventing an entrance into an office or estate granted to an executor by a last will. It proceeds on other grounds. The modern statutes sometimes prevent the entrance, but they cannot take away the title, except for the causes specified in the modern statutes.

[3, 4] At common law an executor derived exclusively from the will itself an estate in his office as executor. His office or estate did not depend on probate of the will or on any grant of letters testamentary; it flowed exclusively from the will itself (Smith v. Milles, 1 T. R. 475, 480; Hartnett v. Wandell, 60 N. Y. 349, 19 Am. Rep. 194), and it vested in the executor from the moment of the testator's death (Com. Dig. Administration, B. 10; Woolley v. Clark, 5 B. & A. 745, 746). It is said by Chancellor Kent that an executor is jure gentium and is only confirmed by a court of probate. I have called the executor's rights in and to his office an estate, because common-law books so call it, doubtless using estate primarily in the old sense of status, but also in the secondary sense of property, in instances where freeholds are devised to the executor for the purpose of sale. In all the particulars just indicated the old common law remains in force in this state, except where changed by statute. I am aware of nothing changing the common-law rule that an executor derives his office and estate from the will, and not from probate, or from the issuance of letters by this court. Hartnett v. Wandell, 60 N. Y. 346, 349, 19 Am. Rep.

194; Van Schaack v. Saunders, 32 Hun, at page 520; Matter of Greeley, 15 Abb. Prac. (N. S.) 393. But the estate of the executor is not strictly proprietary, though his office is. His estate is what the common law calls "in autre droit," or in right of another.

It is generally thought that the office of an executor is peculiar to the common law, but, as I showed in Matter of Mayer, 84 Misc. Rep. 9, 18, 144 N. Y. Supp. 438, this is not so. It would be pedantic at this late day to object to the term "executor," but it is quite worthy of notice that that exceptionally distinguished judge, Lord Hardwicke, condemned the title "executor" as barbarous (Androbin v. Poilblanc, 3 Atk. 300, 301), and he stated, with his usual acumen, that our executor is in reality the "heres testamentarius" of the Roman law, and thus, in so far as personal property is concerned, the "universal successor" of the civil law. This judgment of Lord Hardwicke is important to this discussion, because it demonstrates that even equity originally regarded the executor not primarily as a trustee, but as one who was constituted by the testator himself as the continuation of his prior legal existence. The later conception of the executor as a trustee is not one of law, but of equity, and the development of this conception is precisely similar in both the Roman law and the common law. The æquitas of the civilians converted the legatee or the heres into fiduciarius whenever there was a trust, and in the same way our equity came to regard the executor as a trustee in that forum whenever the rights of legatees or creditors required it of the chancellor. Consequently, in modern equity and by modern statutes, the executor is not always regarded as the mere representative of the deceased, but is treated as a trustee for the benefit of creditors or others interested in the estate. Dox v. Backenstose, 12 Wend. 542. But it is, I believe, a misconception which leads to error to confuse executors with trustees in this court on an application for letters or to treat the executor's right to letters as a matter primarily of equitable cognizance. I have somewhat, perhaps, unduly emphasized this point, but only because it has a direct bearing on this application.

[5] In the consideration of Dr. Cheeseman's application for our letters we are not now permitted to consider the rights of creditors or legatees, but primarily the executor's own common-law right to enjoy the executorship given to him by Mr. Leland's will. This present application is an invocation of the law, not of equity. At some later stage it may be very proper to consider those other phases of an executor's office which concern legatees and creditors, but I hold that that time is not now, and in so holding I am satisfied that I am supported by the best authorities from the very beginning of our law down to the present day.

[6] In the theory of the common law, and this is a most important consideration on this application now here, the executor is treated as "eadem persona" as the deceased for all juristic purposes. That is to say the executor of the common law is the person whom the testator himself has selected and nominated to continue his own juristic personality or existence. The executor is in law the same person as the testator; in equity or by statute it may be otherwise. It is for

this fundamental legal reason that courts of probate are so careful to see to it that the choice of the testator as to his legal continuator is not defeated except for the grave and special causes prescribed by law. Mr. Leland's wife was, I believe, an Italian subject prior to her marriage, and for some reason, not disclosed on this application, he chose neither his wife nor her sons as his executors, although very properly he paid great regard to their natural claims on his bounty. I am bound to assume that his reason for not naming them executors was good. The probate of his will was not disputed, and this fact entitles the desires and choice of the testator in regard to those who are to be his executors to the greatest consideration by the surrogate unless some settled rule of law or some statute disables Dr. Cheeseman from entering on the office expressly bequeathed to him by the terms of Mr. Leland's will.

In all systems of jurisprudence where private ownership is recognized the necessity of carrying on a man's legal existence for some time after his death is recognized. As the Roman law recognized, private property itself has a distinct juristic personality apart from the owner. In countries where community property prevails it is otherwise, for the individual rights there cease with death, and title then devolves by operation of law on the community. The common law is quite otherwise; it stands for individual ownership. The right of the owner to nominate his own legal successor is a fundamental of the common-law system. The limitations on this right should not be inspired by considerations which are suggested by fashionable theories of community property. That this is a distinct tendency at the present day no thinking person familiar with the philosophy of the common law will deny. Yet it has no foundation in the common law of this country.

[7] This review of the theory and application of our common law brings us to the consideration of the points actually involved in this application—the limitations now imposed by statute on the right of the executor to receive a confirmation from this tribunal of a title granted to him by the will itself. The only statute binding on this application is to be found at present in section 2564, C. C. P., which describes those incompetent to receive letters testamentary from this court. Subdivision 5 of this section provides that no person is competent to serve as an executor who is incompetent "for want of understanding." This is the only part of the section invoked on this application. This legislation, although contained in the Code, is not new. It is taken almost verbatim from section 3, 2 R. S. 69, of 1830. That the Revised Statutes were to some extent a codification not only of earlier statutes of this state, but to some extent a codification of the common law itself, is well known. The revisers so said. It is highly probable that the statutory disqualification "by want of understanding" was in the Revised Statutes regarded as a mere restatement of the common-law disability, and consequently that it was intended to apply to imbeciles and lunatics only. It does not justify, in my opinion, the contention of those now opposing Dr. Cheeseman's application for letters that the "want of understanding" must be determined by

the extent of the estate and the peculiar difficulties of a particular administration. Contrary to my general rule, I interrupted counsel so to state during the argument. Further reflection has only strengthened my offhand opinion. To hold otherwise would, I think, be contrary to public policy; it would open up at the instance of recalcitrant heirs a new field of investigation in this court on too many applications for letters testamentary, and it would open the door for that deplorable modern tendency of courts of justice to cast private properties in custodia legis, a tendency to which I am distinctly opposed, because in principle it is contrary to our common law—that profound wellspring of human experience. If such a contention shall in the end prevail, I do not wish to bear any share of the responsibility for the results.

[8, 9] That Dr. Cheeseman's physical deterioration, by reason of two severe paralytic attacks, is very great, the expert testimony of competent experts, well known to me, discloses; but these gentlemen did not and could not state that Dr. Cheeseman was of unsound mind. The neighboring physician, who by preference pursues extensively his profession in the neighborhood of Dr. Cheeseman's country residence, detected no impairment of Dr. Cheeseman's mental efficiency. Now it is to be emphasized that when in health Dr. Cheeseman was a professor in Columbia University and taught on involved subjects requiring profound technical research. His mind must have been recognized as one of an unusually high order. There is no pretense that he was not at the same time a gentleman of the highest character, integrity, and honor. His physical deterioration has not affected his character. A man may be chosen executor for his moral worth alone, the testator ignoring his want of business ability. I think it not necessary to notice, at this time, in detail, the subtle and technical evidence bearing on the precise degree of Dr. Cheeseman's mental efficiency. I am confident that it showed no "want of understanding" in the common-law sense of that term. The contention that the modern use of that term means "want of understanding" as applied to an intricate estate of great extent does not appeal to me. It opens too widely the door for contentions of an undesirable character in this court. If every applicant for letters testamentary should be obliged to justify his selection as executor by disclosing on a trial at law a complete knowledge of the most intricate questions of law and fact connected with the administration of a great estate, few would pass the examination, and a new and undesirable terror would be superimposed on those named as executors. I doubt if the Surrogate's Court is a proper college for such tests and examinations in applications for letters. If only the skilled could, in this court, qualify as executors, we should soon have a new calling, known as "professional executors." Is this to be one of the new reforms imposed on our ancient law? I still doubt it. An honorable executor of a great estate, it may be assumed, will choose wise counsel, learned in the law, to aid him in the technical features of a difficult administration. An honorable man, though invalided, cannot be assumed on this application to be inefficient or of knavish propensities.

[10] At the outset of this contention there was an application for

a physical examination of Dr. Cheeseman, which I denied for the following reason: Section 873, C. C. P., if made applicable in this court by section 2770, C. C. P., is limited to actions for personal injuries. In re Leland, 159 N. Y. Supp. 533.

This denial was immediately followed by the contestants calling Dr. Cheeseman as a witness for themselves, and subjecting him to an examination viva voce in the presence of their medical experts. This bold and trying ordeal to an invalid impressed me, not as his conviction, but as a demonstration of Dr. Cheeseman's continued intellectuality, and that there was no want of understanding in the true sense of the statute, whatever his physical and even mental impairment might be. As I ventured to suggest on the final argument of this application, "Suppose that one had nominated Cæsar as his executor." I chose Cæsar as an illustration because, as statesman, politician, soldier, orator and man of letters, he is admitted to have been the greatest genius known to the world. Now Cæsar is conceded to have been an epileptic, a disease causing great physical deterioration, and, as the alienists say, impairing the efficiency of the mind. Yet who of us would not prefer Cæsar for an executor, with all his physical defects, to the ordinary "hedger and ditcher," possessed of an absolutely sound body and a congenitally sound mind, unimpaired either by disease or physical deterioration? This commonplace, even grotesque, illustration presented, I thought, concretely what is the fallacy in respondent's contention. Physical deterioration is not on this application the question. The degree of mental impairment is not really the question. The simple test of the common law still prevails on such applications as this, and there must be a "want of understanding" to incapacitate an executor to letters testamentary in this court. Nor is this want of understanding to be adjudged by the vastness and intricacy of the responsibilities which a particular executorship entails, but by the sensible common-law test of "want of understanding" divorced from the difficulties of any particular application. An executor chosen may not measure up to particular exigencies; he may indeed fall far below them, but that is the testator's affair. If there be no "want of understanding" in the common-law sense of the term, the applicant for letters is entitled to them in this court.

[11] The application for letters by Dr. Cheeseman should be granted, but without prejudice to an application at any time after qualification to remove him in case it prove that he is unable for any reason to discharge the duties and obligations of an executor of this estate. On such an application the rights of those interested in the estate, either as legatees or creditors or remaindermen, may be fully considered on the equitable grounds now stated in the statute governing revocation of letters testamentary. On such an application for removal all the considerations urged by contestants may very properly be taken into consideration. I do not regard this matter as involving any other issue than that of "want of understanding." Time alone can demonstrate incapacity. At a subsequent moment an actual disability may prove marked, and that fact, if shown, will be entitled to the fullest consideration by the surrogate on an application to re-

voke the letters now decreed, and nothing herein will then be res judicata.

I have examined the New York cases cited by the parties to this proceeding, and they do not convince me that the common-law rules indicated above were intended to be changed by the Revised Statutes. The Code section is in effect the Revised Statutes. I do find in the adjudications some judicial language which I venture to think not sufficiently guarded or well considered, and I find some obiter dicta perhaps rather favorable to the contestants' position on this application, but I find no express and controlling adjudication to the same effect. It is only adjudications which ought to be controlling. If letters are not to be issued to Dr. Cheeseman I prefer that the responsibility therefor shall rest elsewhere.

Application for letters granted. Settle order on notice.