## In the Matter of the Estate of HERBERT A. CANTER, Deceased.

Surrogate's Court, Kings County, January 13, 1933.

*Frank Aranow* [*Harris Berlock* of counsel], for the petitioner.

*Henry Lehrich*, for Samuel S. Pines, objecting creditor.

WINGATE, S. The sole question here presented for decision concerns the propriety of issuance of letters testamentary to one of the executors named in the will of this decedent. Objection has been interposed by one who claims to be a creditor of the estate. None of the distributees under the will join him therein and it has been stated without contradiction that all of the beneficiaries desire him to qualify and act. It is the contention of the objector that this applicant is incompetent for two of the reasons specified in section 94 of the Surrogate's Court Act, namely, *first*, that he is a "felon;" and *second*, that he is "incompetent to execute the duties of such trust by reason of * * * dishonesty."

Although certain unsupported allegations have been made by the objecting party which, if substantiated, might have had a tendency to show acts of dishonesty other than that which resulted

in his conviction in the Federal courts, no evidence has been adduced in this regard and decision must be predicated solely on the admitted facts respecting that conviction. These are that the applicant, who was a brother of the decedent, was, with three others, indicted in the United States District Court for the Southern District of New York for a violation of section 37 of the United States Criminal Code which provides: " If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

After trial on this indictment in the United States District Court, the present applicant was found guilty, and on September 23, 1926, was sentenced to a term of a year and a day in the United States Penitentiary at Atlanta, Ga. This conviction was never reversed or set aside and was affirmed on appeal.

It is alleged in the replying affidavit and not controverted, however, that no capias for arrest was ever issued under this conviction and the applicant never served an hour of imprisonment thereunder.

After the affirmance by the Circuit Court of Appeals, and the dismissal of a writ of certiorari to the United States Supreme Court, an application was made to admit the defendants to probation. The memorandum of Judge COLEMAN, granting the application, read in part: " Defendants were convicted in September, 1926, of a conspiracy to defraud the Government in the sale of surplus war material. * * *

" The crime of which the defendants were convicted was committed in the latter part of 1919 or the early part of 1920. They were not brought to trial until about six and a half years later. They were not indicted at all until July, 1923, and the indictment under which they were tried was not returned found until August, 1925, which was about five and a half years after the commission of the crime.

" I have carefully gone into the facts of the crime and have tried to reconstruct in my own mind the entire situation. Taking into account the informality and even confusion in the Government's dealings and the unsettled state of mind which affected almost every one at that time, so soon after the war, I do not believe that defendants' moral guilt was as great as it would have been under more orderly conditions. The jury in finding them guilty recommended leniency, and in view of the defendants' domestic situation,

the suffering that they have already endured, and the good character that they have shown in everything except the transactions for which they were indicted, I believe that this is a proper case for probation. I think that the ends of justice and the best interests of the public will be subserved thereby."

This was followed on December 31, 1929, by the issuance to this applicant by the President of the United States of "a full and unconditional pardon," which recited many of the facts previously noted, and that "it has been made to appear to me that" the present applicant, since his discharge from probation "has conducted himself as a law-abiding citizen."

It is conceded that under Federal law (U. S. Crim. Code, § 335) the offense of which the applicant was convicted was a felony. Under the laws of the State of New York (Penal Law, § 580) a conspiracy is only a misdemeanor.

The concrete, basic, question for determination, therefore, is whether a person who, approximately a dozen years ago, infringed the laws of another jurisdiction by an act which that jurisdiction designated as a felony, but which our laws deem merely a misdemeanor and was convicted therefor in such jurisdiction, is a "felon" or "incompetent," by reason of "dishonesty" within the terminology of section 94 of the Surrogate's Court Act, to receive letters testamentary under a will drawn half a generation subsequent to the offense, in spite of the fact that his subsequent good conduct has been signalized by the authorities of such other jurisdiction and the record is devoid of any suggestion of any other misconduct either before or after the commission of the particular offense.

An adequate understanding of the proper scope and construction of section 94 requires a review of the law existing previous to its enactment. It is a fact familiar to all students of estate law, that prior to the Reformation, testate administration was regulated by the ecclesiastical courts which refused to deny the rights of any person named by the testator to administer his affairs, except on the grounds of the excommunication, idiocy or lunacy of the nominee (Godolphin's Orphan's Legacy, chap. 6; *Matter of Leland,* 96 Misc. 419, 422; 219 N. Y. 387, 393; *Wood* v. *Wood,* 4 Paige, 299, 302), the two latter exceptions being merely in consequence of the fact that such individuals were incapable of expressing acceptance of the office. (Bacon Abr. Exrs. A, 5; Walker Exrs. 8; Toller Exrs. 32; *Matter of Leland, supra.*)

As is pointed out by Surrogate Fowler in the case last cited (at p. 428): "In all systems of jurisprudence where private ownership is recognized the necessity of carrying on a man's legal existence for some time after his death is recognized. * * * The right of

the owner to nominate his own legal successor is a fundamental of the common law system."

With this centuries-old background of legal history, the Legislature of the State of New York, in 1829, enacted a statute reading as follows:

" Section 3. No person shall be deemed competent to serve as an executor, who, at the time the will is proved, shall be,

" 1. Incapable in law of making a contract, (except married women:)

" 2. Under the age of twenty-one years:

" 3. An alien who has not taken the preliminary measures to entitle him to naturalization:

" 4. Who shall have been convicted of an infamous crime:

" 5. Who upon proof shall be adjudged incompetent by the surrogate to execute the duties of such trust, by reason of drunkenness, dishonesty, improvidence, or want of understanding.

" If any such person be named as the sole executor in any will, or if all the persons named therein as executors be incompetent, letters of administration with the will annexed shall be issued, as hereinafter provided, in case of all the executors renouncing." (2 Rev. Stat. part II, chap. 6, tit. II, art. 1.)

No good purpose would be served by tracing the re-enactment, with slight changes, of this section and its companion section (§ 32 [2 Rev. Stat. part II, chap. 6, tit. II, art. 2]) respecting administration, through chapter 362 of the Laws of 1863, chapter 782 of the Laws of 1867, chapter 79 of the Laws of 1873, and chapter 686 of the Laws of 1893, into section 2612 of the old code, section 2564 of the later code and finally into the present section 94 of the Surrogate's Court Act. The mere comparison of the first statute with the one now in force demonstrates in how satisfactory a manner the legislators of over a century ago performed their task in this regard. The only change of any present moment which the experience of over a century has found necessary in the statute originally drawn, was in the substitution of the word " felon " for the phrase " who shall have been convicted of an infamous crime," which alteration was made in 1914 (chap. 443) upon the enactment of the later code. The reason for this change undoubtedly lay in the somewhat inexplicable difficulty which the courts had experienced in the construction of the former provision. The effect of this alteration will be considered later.

The particular pertinency of this brief historical consideration is to enable the court to arrive at the proper viewpoint in the construction of the present statute. It and its forerunners were in direct and somewhat violent derogation of the previously existing

common-law right of a testator to name as his executor any person whom he elected, provided only that the nominee was not an idiot or a lunatic. For this reason, statutory limitations placed upon the right must be strictly construed in favor of the eligibility of the nominee. (*Psota v̌. Long Island R. R. Co.*, 246 N. Y. 388, 393; *Dean* v. *Met. El. Ry. Co.*, 119 id. 540, 547; *Matter of Marsh*, 143 Misc. 609, 614; *Matter of Smith*, 136 id. 863, 880, and cases cited.)

This principle has received frequent recognition by the courts in the many cases which have construed the statute. The language employed in a few of the many which might be cited will prove illuminating.

In *Matter of Latham* (145 App. Div. 849) the court says (at p. 854): " To refuse to grant letters to an executor named in a will is no light matter and can be justified only upon the grounds stated in the Code * * *. *Unless the case can be brought within the letter and spirit of the statute the surrogate has no discretion to refuse letters.*" (Italics not in original.)

The Court of Appeals said in *Matter of Leland* (219 N. Y. 387, at p. 393): " The courts will not undertake to make a better will nor name a better executor for the testator. They will not add disqualifications to those specified by the statute, nor disregard testator's wishes by too liberal an interpretation of the specific disqualifications." (See, also, *McGregor* v. *McGregor*, 3 Abb. Dec. 92, 96; *Shields* v. *Shields*, 60 Barb. 56, 60; *Ballard* v. *Charlesworth*, 1 Dem. 501, 502.)

It being obvious, therefore, that the statute of disqualification is to be strictly construed in favor of the testator's nominee for executor of his estate, the next inquiry is as to the applicability of the statutory inhibitions to the applicant in the case at bar.

The first question to be considered is the interpretation which should be placed upon the phrase " incompetent to execute the duties of such trust by reason of drunkenness, dishonesty, improvidence or want of understanding." It is not surprising that a wealth of judicial utterances on the proper construction of this disability should have accumulated in the period of almost one hundred and four years since its original enactment.

In respect to the four grounds included within this subdivision, the attitude of the courts is well illustrated by the language of the Court of Appeals in the early leading case of *Emerson* v. *Bowers*, (14 N. Y. 449). This determination concerned itself chiefly with the " improvidence " envisaged in the phraseology of the statute. The court decided that an illiterate person of small personal means, who had used estate moneys for his own ends without giving adequate security and had intrusted the estate fund to his attorney

without keeping himself informed in regard to it, had not forfeited his right to act as executor. The court says (at p. 454): " But to hold that these acts    *    *    *    make out a case of incompetency, by reason of improvidence in the sense of the statute, would be to give the language a very loose and undiscriminating interpretation. All departures in conduct from the principles of rectitude, including all abuses of trust, are unwise and inexpedient, and therefore, in a certain sense, improvident; but they do not constitute the kind of improvidence which the legislature had in view in these enactments. A very careful, shrewd and money making person may be guilty of negligence or abuse in a fiduciary capacity, but such a person is not improvident in the sense of the statute. The words with which the term is associated, ' drunkenness,' ' want of understanding,' are of some importance in arriving at its true construction. *The term evidently refers to habits of mind and conduct which become a part of the man, and render him generally, and under all ordinary circumstances, unfit for the trust or employment in question.*" (Italics not in original.)

This thought of " habits of mind " pervades the vast majority of cases which have involved a construction of this clause. (See, for examples, *Ballard* v. *Charlesworth*, 1 Dem. 501, 502; *Coope* v. *Lowerre*, 1 Barb. Ch. 45, 47; *Coggshall* v. *Green*, 7 Hun, 471, 472; *Matter of Ferguson*, 41 Misc. 465, 468; *Matter of Flood*, 236 N. Y. 408; *McMahon* v. *Harrison*, 6 id. 443, 448; *Matter of Riede*, 138 App. Div. 83, 84; *Martin* v. *Duke*, 5 Redf. 597, 600; *Shields* v. *Shields*, 60 Barb. 56, 61; *Matter of Manley*, 12 Misc. 472, 475; *Matter of Reichert*, 34 id. 288; *Matter of Selling*, 2 N. Y. Supp. 634, not officially reported; *Freeman* v. *Kellogg*, 4 Redf. 218, 224; *Matter of Cady*, 36 Hun, 122; affd., 103 N. Y. 678.)

Can it be said that the commission of a single criminal offense, though involving an act of dishonesty, perpetrated approximately thirteen years ago, with no indication of previous or subsequent departure from the path of rectitude, indicates " dishonest habits of mind " " from which a reasonable apprehension may be entertained that the funds of the estate would not be safe in the hands of the executor." (*Matter of Latham*, 145 App. Div. 849, 854.) (See, also, *Shields* v. *Shields*, 60 Barb. 56, 61.) Neither this court nor any other unprejudiced person would so deem it. A single act is insufficient to demonstrate a habit of mind and a solitary deviation from the right in which an individual might indulge during conditions such as are depicted in Judge COLEMAN's memorandum would raise no inference whatsoever that its perpetrator, many years later, would be derelict in the performance of a trust reposed in him by a brother, no doubt fully informed respecting his real

character and inclinations. Certainly if a recovery on a stolen note, a verdict in a suit for a deduction and a refusal of a discharge under the insolvent act, were, as the widely cited case of *Coope* v. *Lowerre* (1 Barb. Ch. 45) deemed them, insufficient to bar the testamentary fiduciary then under consideration, the single act of the applicant in the present case should not do so.

There remains for consideration the second objection, that the applicant is incompetent to receive letters by reason of his being a "felon." As has been noted, the phraseology of this disqualification is one of the very few in which any alteration has been made since the enactment in 1829. The original phrase read: " who shall have been convicted of an infamous crime." It is, of course, obvious that the Legislature must have had some express purpose in mind in making this alteration in the 1914 Code, particularly in view of its failure to change any other portion of the enactment. A study of the decisions of the courts which preceded this amendment indicates such purpose.

This object was to clarify the meaning of this particular incapacity, since, as noted by Mr. Jessup (Jessup-Redfield on Law and Practice in the Surrogate's Court [1930 ed.], § 599), " the courts wrote voluminous opinions on what crimes were 'infamous.' " Whether or not one is to concur with the learned author, that the meaning of the supplanted phrase was sufficiently fixed as to make the extended dissertations of the courts respecting its connotation superfluous, his conclusion that the alteration of the language makes the legislative intent incapable of reasonable misunderstanding, seems inescapable.

Obviously a felon, though the term is undefined in the body of New York statutory law, is " a person who commits a felony." (Stand. Dict. 1930 ed.) The meaning of " felony " is defined in section 2 of the Penal Law as " a crime which is or may be punishable by: 1. Death; or, 2. Imprisonment in a state prison."

Since the enactment under construction is, to a certain degree at least, in *pari materia* with that of the penal section just quoted, it follows that the terminology of the former is naturally to be interpreted in the light of the legislative intent envisaged in the latter. (*People ex rel. Doscher* v. *Sisson*, 222 N. Y. 387, 393; *Matter of Littleton*, 129 Misc. 845, 848.) So far as the research of the court has been able to disclose, section 2 of the Penal Law is the sole location in the statutes of this State of any legislative definition indicating the meaning attached by this branch of the government to the term " felony." In the absence of strong countervailing considerations, not here present, therefore, it must control the meaning of the term " felon " in section 94 of the Surrogate's Court Act.

This opinion might well terminate with a reiteration of the previously noted principle that to effect an exclusion of a named executor the case must be brought both within the letter and spirit of the statute. (*Matter of Latham, supra.*) Obviously, an offense against the Federal government is not " punishable by * * * imprisonment in a state prison " within the definition of section 2 of the Penal Law, wherefore it does not come within the letter of the law and on the authority cited is insufficient to authorize the surrogate to deny letters to the applicant.

Since, however, such a determination might to some savor of a decision on a bare technicality, the court prefers to prolong the present discussion in an effort to demonstrate the reasons for its belief that a holding of incompetency on such a foreign conviction would be utterly alien to the spirit as well as the letter of the enactment.

The entire purpose of all portions of the section other than the single one of " a felon " here under consideration, is to add assurance to the security of the estate and its due administration. Contracting on its behalf is essential in the liquidation of its assets as well as for other patent reasons; wherefore, a minor could not properly attend to its affairs even if possessed of adequate business ability. The same considerations apply in even greater measure to an incompetent. " An alien not an inhabitant of this State " would, in a majority of instances, not be readily amenable to the supervisory powers of the courts, and finally, a person demonstrated to be " incompetent to execute the duties of such trust by reason of drunkenness, dishonesty, improvidence or want of understanding " would, in this regard, be on a par with an infant or an incompetent. On the other hand, this might or might not be so in the case of a felon, depending on the particular circumstances of the case. In any event if it were, it is scarcely conceivable that the characteristics of the individual would not be such as to bar him from office under the succeeding subdivision covering incompetence by reason of dishonesty, etc.

It is apparent, therefore, that the incapacitation of a felon, or to use the old phrase, one " who shall have been convicted of an infamous crime," must have been motivated by some other legislative consideration than the elsewhere dominant thought of proper administration of the estate. This purpose is obvious when it is recalled that conviction of such a crime customarily carries with it a loss of civil rights. This result, as is pointed out in many cases, is an additional punishment imposed by the sovereign whose laws have been violated, upon the individual, for his serious anti-social act. (*Commonwealth* v. *Green,* 17 Mass. 515, 548; *Sims* v.

*Sims*, 75 N. Y. 466, 470.) (See, also, *Logan* v. *United States*, 144 U. S. 263, 303.)

It is primary, however, that no government will enforce penalties for the violation of the criminal laws of another. (*The Antelope*, 10 Wheat. 66, 123; *Loucks* v. *Standard Oil Co. of N. Y.*, 224 N. Y. 99, 102; *Matter of Engel*, 140 Misc. 276, 280.) It follows, therefore, that the conviction in a jurisdiction other than the State of New York can carry with it no disability in this State, since any effectuating thereof here would be a violation of this basic principle. As is said by the United States Supreme Court in *Logan* v. *United States* (144 U. S. 263, at p. 303): " At common law, and on general principles of jurisprudence, when not controlled by express statute giving effect within the State which enacts it to a conviction and sentence in another State, such conviction and sentence can have no effect, by way of penalty, or of personal disability or disqualification, beyond the limits of the State in which the judgment is rendered." (Citing authorities.)

This principle is discussed at length and decided in like manner in *Commonwealth* v. *Green* (17 Mass. 514, at pp. 538–550); *Sims* v. *Sims* (75 N. Y. 466, 468–472); *National Trust Co.* v. *Gleason* (77 id. 400, 410); *Van Voorhis* v. *Brintnall* (86 id. 18, 36); *O'Brien* v. *Neubert* (3 Dem. 156, 157–161).

An additional cogent consideration productive of a like result is advanced in *Sims* v. *Sims* (*supra*, at p. 469): " Crimes might be felonies in other States which did not fall within our statutory definition."

This thought is developed in *People* v. *Gutterson* (244 N. Y. 243, at p. 249): " There may be doubt whether the Legislature intended that conviction only in the courts of this State, where trial is conducted in accordance with the standards and subject to the safeguards against error provided by our own law, should be given such effect, or whether conviction under the laws of any other State, government or country should be given like effect. * * * There can be no doubt, however, that the Legislature could not reasonably have intended by the use of the words ' crime punishable by imprisonment in a State prison ' to include crime which is not so punishable under the laws of this State. Unless the Legislature had definite standard of crime in mind, its classification would be to that extent arbitrary. We may not assume in the absence of unambiguous language that the Legislature intended to give to a conviction for an offense which we may regard as innocent, legal consequences within this State; or to treat as a confirmed criminal here one who has previously done no act to which we have attached the penalty of imprisonment in a State prison."

Standards of conduct vary in different communities and it is, indeed, a wise and salutary policy which refrains from an attempt to impose on those residing in a given locality the possibly alien and obnoxious notions of another in this regard. In the opinion of many distinguished students of sociology, many of the untoward conditions of the present time are in large, if not in preponderant, measure due to a violation of this principle. Merely because the residents of certain other States may deem cigarette smoking a crime, and have crystallized this sentiment into a statute, could not alter the attitude of this community to the act. To hold that a conviction of such an offense in a distant locality should in this community result in branding one of its citizens as, in effect, infamous, would outrage the sense of our people.

The facts of the case at bar differ in degree but not in kind from those supposed. The present applicant committed an offense against the laws of another jurisdiction which that sovereignty deemed infamous. The same offense if committed against the laws of the State of New York would not have been so considered, and particularly in the elucidation of a statute which, under established rules of interpretation, is to be construed strictly in favor of the person against whom it is invoked, such act must be given an effect conforming to the sentiment of this community as reflected in the laws enacted by its chosen representatives.

This court is aware of the fact that the Appellate Division for the First Department, in its construction of section 88 of the Judiciary Law respecting the disbarment of attorneys, has in a considerable number of cases reached a conclusion differing from that here attained. (*Matter of Kuntz*, 178 App. Div. 911; *Matter of Boetzel*, 191 id. 881; *Matter of Hodgskin*, 193 id. 217; *Matter of Wilhoit*, 220 id. 132; *Matter of Lindheim*, 195 id. 827; *Matter of Kaufman*, Id. 830; *Matter of Innes*, 176 id. 902; *Matter of Kirchner*, 224 id. 222; *Matter of Brinkman*, 226 id. 55; *Matter of Burrough*, Id. 60; *Matter of Gladstone*, Id. 61; *Matter of Singer*, 156 id. 85; *Matter of Langfur*, 229 id. 198; *Matter of Ackerson*, 218 id. 388.) This court is of the opinion, however, that the subject-matter of these decisions is distinguishable both by reason of the difference in history of the statutes construed and of the fact that the office of an attorney at law is not a right but a privilege the nature of which is *sui generis*. Any abuse of the position might produce such widespread consequences that it is within the discretion of the court of appointment to hold that an attorney, like Caesar's wife " must be above suspicion."

If, however, the court be in error as to the distinguishability of these cases from that at bar, it must nevertheless decline to

follow them in view of the pronouncements of the Court of Appeals in *Sims* v. *Sims* and the other cases heretofore cited, which furnish ample support for the views herein expressed.

It is, therefore, determined that the applicant in this case is not incompetent within the contemplation of section 94 of the Surrogate's Court Act to receive letters testamentary on the facts herein disclosed.

Proceed accordingly.